<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CRESTRON ELECTRONICS, INC., | Hon. Faith S. Hochberg, U.S.D.J. |
| Plaintiff, | Civil Case No. 11-3492 (FSH)(MAH) |
| v. | **OPINION** |
| CYBER SOUND & SECURITY INC., | Date: February 9, 2012 |
| Defendant. |  |

<u>**HOCHBERG, District Judge**</u>;

　　This matter comes before the Court upon Plaintiff and Counterclaim-Defendant Crestron

Electronics, Inc.'s ("Crestron") motion to dismiss Defendant and Counterclaim-Plaintiff Cyber

Sound & Security Inc.'s ("Cyber Sound") Amended Counterclaim pursuant to Fed. R. Civ. P.

12(b)(6) [Docket # 32].  The Court has reviewed the submissions of the parties and considered

the motion on the papers in accordance with Fed. R. Civ. P. 78.

## I.　　<u>FACTUAL BACKGROUND</u>[1]

　　Counterclaim-Plaintiff Cyber Sound, an Arizona corporation, is a dealer, integrator, and

installer of high-end automation and control products for the residential market.  These products

control residential systems including audio/video, lighting, heating and air-conditioning.  Cyber

Sound's clients include homeowners, home builders, and architects.  Counterclaim-Defendant

Crestron, a New Jersey corporation, is a manufacturer of residential and commercial control and

---

[1] The facts set forth here are drawn from Counterclaim.  At the motion to dismiss stage, this Court accepts these facts as true.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

automation systems.  Cyber Sound purchases components from manufacturers such as Crestron and installs automation and control systems in its customers' homes.  Cyber Sound is an authorized dealer of several manufacturers and, from May 2000 through April 2011, was an authorized dealer of Crestron products pursuant to a non-exclusive dealer agreement (the "Agreement").

Crestron terminated the Agreement on April 29, 2011, following a nearly two-year period during which Crestron sought to pressure Cyber Sound into dropping its distribution of products manufactured by Savant, a direct competitor of Crestron's.  Cyber Sound alleges that in August 2009, after it began selling and installing Savant products, Crestron executives threatened to terminate the Agreement unless Cyber Sound ceased its distribution of Savant products.  Cyber Sound ceded to this demand and dropped Savant products because Crestron was the largest supplier in the market and Cyber Sound had installed hundreds of Crestron systems, which it wanted to continue to service.  One month later, Cyber Sound began selling Savant products again after being informed by Crestron that after receiving bad publicity regarding its demands that its dealers drop Savant, it no longer objected to Cyber Sound offering Savant products.

On year later, on September 5, 2010, Crestron informed Cyber Sound that unless it ceased offering Savant products, Crestron "would work together with a band of local Crestron dealers to beat Cyber Sound on any jobs that Cyber Sound might pursue that did not involve Crestron equipment."  Am. Countercl. ¶ 17.  Crestron then contacted several Cyber Sound customers directly and attempted to divert their business to other Crestron dealers.  When confronted, Crestron stated that it demanded all of Cyber Sound's business or none, to which Cyber Sound responded "that it would be 'none then.'"  *Id.* ¶ 18.  Crestron immediately contacted local Arizona dealers to inform them that it had dropped Cyber Sound as a dealer and

also contacted Cyber Sound customers to tell them that because Cyber Sound had been dropped as a dealer it could no longer service those customers' installed Crestron systems.

At Cyber Sound's request, Crestron then agreed that Cyber Sound could remain a Crestron dealer in order to continue servicing customers with installed Crestron systems, but stated that it would do everything possible to compete with Cyber Sound on new installations that did not involve Crestron products.  As a result of this conflict and "reliability issues" with Crestron products, Cyber Sound began promoting Savant more actively for high-end residential sales, though it continued to offer Crestron products.

Crestron finally terminated the Agreement on April 29, 2011 following the publication in a trade magazine of an interview with Cyber Sound's President, in which he made several positive comments about Savant products.  On June 16, 2011, Crestron filed its suit against Cyber Sound and on July 21, 2011, demanded that Cyber Sound cease providing technical assistance to its customers with installed Crestron systems.  Cyber Sound then arranged for another Crestron dealer to service Cyber Sound's Crestron customers, but Crestron threatened to block that dealer from providing such service "[i]n an attempt to crush Cyber Sound and destroy [its] good will."  *Id.* ¶ 23.

Cyber Sound claims that it has lost customers, and will continue to lose customers, due to its inability to service their installed Crestron systems.  Cyber Sound alleges that Crestron caused this harm by: informing the public that Cyber Sound cannot service its customers with installed Crestron systems; threatening Cyber Sound with substantial penalties if it uses the customer-specific reprogrammed software to service a customer; and intimidating authorized Crestron dealers and programmers from dealing with Cyber Sound in connection with servicing its customers.

Crestron now moves to dismiss Cyber Sound's counterclaims for: Violation of the Sherman Act, 15 U.S.C. § 1 (Count I); Violation of the Sherman Act, 15 U.S.C. § 2 (Count II); Violation of the Clayton Act, 15 U.S.C. § 14 (Count III); Violation of the Arizona Antitrust Act, §§ 44-1401 *et seq.* (Count IV); Interference with Contract (Count V); Interference with Prospective Economic Advantage (Count VI); Defamation (Count VII); and Violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count VIII).

## II.    PROCEDURAL BACKGROUND

Crestron filed the original Complaint on June 16, 2011 and the First Amended Complaint on June 20, 2011.  Cyber Sound filed its Answer and Counterclaim on August 16, 2011. Crestron filed a motion to dismiss the Counterclaim on September 9, 2011.  That motion was dismissed as moot after Cyber Sound filed an Amended Answer and Counterclaim on October 3, 2011.  Crestron then filed the motion to dismiss that is currently before the Court.

## III.    STANDARD OF REVIEW

"To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 127 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) ("[S]tating . . . a claim requires a [counterclaim] with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.") (internal quotations omitted).

When considering a motion to dismiss under *Iqbal*, the Court must conduct a two-part analysis. "First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the [counterclaim's] well-pleaded facts as true, but may disregard any legal

4

conclusions. Second, a District Court must then determine whether the facts alleged in the

[counterclaim] are sufficient to show that the plaintiff has a plausible claim for relief." *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations and quotations

omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements

of a cause of action will not do. Nor does a [counterclaim] suffice if it tenders naked assertions

devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal quotations and

alterations omitted).

## IV.     DISCUSSION

### A.     Violation of the Sherman Act § 1

Section 1 of the Sherman Act declares to be illegal "[e]very contract, combination in the

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several

States, or with foreign nations." 15 U.S.C. § 1. "To establish a section 1 violation for

unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2)

that produced anti-competitive effects within the relevant product and geographic markets; (3)

that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of

the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 442 (1997).

Crestron argues that Cyber Sound has not alleged facts sufficient to satisfy these elements.

#### 1.     *Concerted Action*

To establish liability under section 1, a plaintiff must demonstrate that the challenged

practice imposed an unreasonable restraint on trade. *In re Ins. Brokerage Antitrust Litig.*, 618

F.3d 300, 315 (3d Cir. 2010). The illegality of the restraint may be demonstrated under the *per*

*se* standard or under a rule of reason analysis. *Id.* at 315-16. The *per se* standard applies to some

practices whose anticompetitive effect is presumed based on judicial experience. *Id.* at 316; *see*

*also United States v. Brown Univ.*, 5 F.3d 658, 670 (3d Cir. 1993) ("Per se rules of illegality are

5

judicial constructs and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition.") (citations omitted).  Cyber Sound does not argue that Crestron's actions constitute a *per se* violation of the antitrust laws, therefore, its claims will be considered under a rule of reason analysis.  "Proving a section 1 claim by this approach requires the plaintiff to show that the defendant's conduct had an 'adverse, anticompetitive effect within the relevant product market.'"  *Franco v. Conn. Gen. Life Ins.*, No. 07-6039(SRC)(PS), 2011 WL 4448908, at *27 (D.N.J. Sep. 23, 2011) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005)).

According to Cyber Sound, the "concerted action" by Crestron underlying this § 1 claim is the existence of "exclusionary agreements" that Crestron entered into with "Cyber Sound and other Crestron dealers for the purpose of excluding competition in the Market . . . by precluding [them] . . . from handling" Savant products.  Am. Countercl. ¶ 38.  Cyber Sound further alleges that Crestron "used its dominant power in the market to prevent Cyber Sound from servicing its existing and prospective customers who have installed systems with Crestron products."  *Id.* ¶ 39.  The "exclusionary agreements" that Cyber Sound refers to are the dealer agreements between Crestron and its authorized dealers.  Cyber Sound, itself, was party to such an agreement with Crestron for over ten years.  It is undisputed that Crestron's dealer agreements are expressly non-exclusive and permit dealers to sell products manufactured by Crestron's competitors such as Savant.  Based on this non-exclusivity, Crestron contends that Cyber Sound's allegation of concerted action in restraint of trade fails.

Cyber Sound argues that despite the non-exclusive language in these dealer agreements, Crestron threatens to terminate dealers who "defy Crestron's unwritten, but manifest rule of exclusivity."  Opp. Br. 4.  Crestron points out that, because the dealer agreements are non-

exclusive, Cyber Sound's allegations regarding Crestron's anticompetitive actions towards its dealers necessarily implicate unilateral, as opposed to concerted action.

The Third Circuit has held that "unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 55 (3d Cir. 2007) (internal quotations and alterations omitted); *see also In re Baby Food Antitrust Litig.*, 155 F.3d 112, 117 (3d Cir. 1999) ("The existence of an agreement is the hallmark of a Section 1 claim. Liability is necessarily based on some form of concerted action.") (internal citation and quotation omitted). Cyber Sound neither responded to this argument nor cited any case law supporting its position that Crestron's actions satisfy the concerted action requirement. Cyber Sound has failed to allege facts (take as true) sufficient to demonstrate any concerted action involving Crestron. Therefore, Cyber Sound's Sherman Act § 1 claim will be dismissed.

### 2. *Relevant Product Market*

Crestron argues that Cyber Sound's Sherman Act § 1 claim (as well as the Sherman Act § 2 and the Clayton Act claims) should be dismissed because Cyber Sound fails to allege anticompetitive effects within a properly defined relevant product market. Cyber Sound has the burden of defining the relevant market. *Queen City Pizza*, 124 F.3d at 436. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it." *Id.* (internal quotations omitted). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* "Interchangeability implies that one

product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Id.* at 437 (internal quotations omitted).  Cross-elasticity of demand between products means that "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991).

In its Counterclaim, Cyber Sound defines the relevant market as "the sale and distribution of high-end residential automation and control systems," Am. Countercl. ¶ 33, defining "high-end" systems as those "cost[ing] the dealer twenty five thousand dollars or more in manufacturer's equipment." *Id.* ¶ 8.  Cyber Sound defines the geographic market as the United States, with Arizona as a relevant submarket. *Id.* ¶¶ 34-35.  Cyber Sound alleges, on information and belief, that Crestron has an 80% market share in this market for high-end residential systems. *Id.* ¶ 8.

Crestron argues that Cyber Sound's failure to refer to the rule of interchangeability or cross-elasticity of demand is an independent basis on which to dismiss each of the anti-trust claims (Counts I-IV).  Specifically, Crestron argues that Cyber Sound fails to allege a relevant market "that clearly encompasses all interchangeable substitute products," *Graco, Inc. v. PMC Global, Inc.*, No. 08-1304, 2009 WL 904010, at *32 (D.N.J. Mar. 31, 2009), because it does not allege which products or components that make up these control systems are interchangeable with one another functionally and/or economically.  Cyber Sound contends that its description of the relevant market along with its allegation that Savant products directly compete with Crestron products, Am. Countercl. ¶ 15, is sufficient and that it is not necessary to allege that specific products within the market of high-end residential control systems are interchangeable on a product by product basis.  With respect to the price boundary of the relevant market alleged by

Cyber Sound, Crestron argues that the $25,000 threshold is arbitrary and that Cyber Sound has failed to allege that systems costing dealers less than that amount do not compete with systems in the proposed relevant market.

The Court agrees with Crestron that Cyber Sound fails to sufficiently allege a relevant product market.  "As pled, [Cyber Sound] does not define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand nor does it allege a proposed relevant market, as pled, that clearly encompasses all interchangeable substitute products." *Graco*, 2009 WL 904010, at *32.  Cyber Sound fails to allege which components of these systems are interchangeable and also fails to allege that the overall systems are interchangeable.  Cyber Sound does not allege that Crestron and its competitors such as Savant, manufacture and sell automation and control systems off the shelf.  In fact, the Counterclaim clearly alleges that, as the dealer, Cyber Sound, itself, designs these systems by "select[ing] among components offered by various manufacturers depending on the nature of the component, its cost, its quality, and its ease of installation and maintenance, among other factors."  Am. Countercl. ¶ 4.  Therefore, the interchangeability of these components produced by different manufacturers is vital to defining the relevant product market.

Additionally, Cyber Sound has not pled any facts supporting its price-based market definition, in that it has not alleged that the market for automation and control systems with dealer costs over $25,000 is distinct from the market for automation and control systems with dealer costs below $25,000, or that there products across that divide do not compete with each other.  *See e.g.*, *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (rejecting plaintiff's alleged product market of "super-premium ice cream" because it could not show that "people who buy so called 'super-premium' or 'luxury' ice creams do not buy others which are lower in the spectrum of price or quality."); *United States*

9

*v. Jos. Schlitz Brewing Co*., 253 F. Supp. 129, 145 (N.D. Cal. 1966) (rejecting plaintiff's product market of "premium" beer due to failure to demonstrate that beer does not compete across price ranges).  Therefore, Cyber Sound has not sufficiently established that its proposed $25,000 and up market "encompass[es] all interchangeable substitute products."  *Queen City Pizza*, 124 F.3d at 436.

### 3.      *Anticompetitive Effects and Antitrust Injury*

Crestron argues that Cyber Sound has not sufficiently alleged that Crestron's actions led to anticompetitive effects in the relevant market or that Cyber Sound suffered an antitrust injury stemming from any anticompetitive effects caused by Crestron.

In order to state a claim for relief under either sections 1 or 2 of the Sherman Act, Cyber Sound must plausibly allege that Crestron's conduct "harm[ed] the competitive process itself," not that its conduct "merely harm[ed] competitors."  *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 308 (3d Cir. 2007).  "It is axiomatic that the antitrust laws were passed for the 'protection of *competition*, not *competitors*."  *Brooke Grp. Ltd.*, *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy the competitive process.").

Cyber Sound argues that it has sufficiently pled that Crestron's actions had anticompetitive effects because they were designed to "prevent[] competitors such as Savant from entering the market of high-end residential control systems."  Opp. Br. 7.  However, Cyber Sound has not alleged sufficient facts indicating that Crestron's actions had any actual anticompetitive effects by keeping Savant or any other competitors out of the market.  It is undisputed that Crestron's dealer agreements were not exclusive.  Cyber Sound does not even

allege that Crestron attempted to coerce its dealers into exclusively carrying Crestron products. Rather, Cyber Sound concedes that Crestron knew that Cyber Sound was carrying products manufactured by Control4, but did not require Crestron to drop them.  Am. Countercl. ¶ 15. While Cyber Sound does allege that Crestron demanded that it drop Savant products in August 2009, it admits that Crestron withdrew that demand in September 2009.  *Id.* ¶¶ 15-16.  Therefore, Cyber Sound merely alleges that due to Crestron's demands, it ceased carrying Savant products for less than two months.  Moreover, Cyber Sound does not plausibly allege that Crestron's competitors, including Savant, were substantially harmed or prevented from competing in the proposed relevant market as a result of Crestron's actions.

Cyber Sound's reliance on *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) is misplaced.  Cyber Sound cites *LePage's* for the proposition that "[w]hen a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, *i.e.* predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."  *Id.* at 159.  First, as discussed below, Cyber Sound has not alleged sufficient facts demonstrating Crestron's monopoly power. Second, the defendant in *LePage's* was shown to have entered into actual exclusive contracts with certain dealers as well as to have offered bundling rebates to other dealers that "effectively required dealing exclusively" with the defendant.  *Id.* at 147, 159.  Cyber Sound has not alleged that Crestron entered into exclusive dealer agreements with its dealers or that its practices effectively required dealers to deal exclusively with Crestron.

Because Cyber Sound has not sufficiently alleged that Crestron's actions "had substantial anticompetitive effects," *Gordon*, 423 F.3d at 211, its Sherman Act claims will be dismissed.

With respect to antitrust injury, Crestron argues, and the Court agrees, that Cyber Sound has failed to plead facts, which (taken as true), demonstrate that it has sustained an "injury of the

type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," as a proximate result of Crestron's actions. *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 329 (D.N.J. 1999) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Cyber Sound alleges that as a result of Crestron's "exclusionary practices" (i.e., the "exclusionary agreements with Cyber Sound and other Crestron dealers for the purpose of excluding competition in the Market . . . by precluding Cyber Sound and other present or former dealers from handling the products of a new, and potentially major, competitor, namely, Savant," Am. Countercl. ¶ 38, it has "suffered damage." *Id.* ¶ 40.  However, Cyber Sound has admitted that it only refrained from offering Savant products for a period of less than two months.  The only actual harm alleged by Cyber Sound in its Counterclaim, is its lost business caused by Crestron not permitting it to service customers with installed systems using Crestron products. *Id.* ¶ 24.  However, Cyber Sound has failed "to articulate the connection between [this harm] and a restraint on trade."  *Franco*, 2011 WL 4448908, at *36 (dismissing a Sherman Act § 1 claim and stating that "[t]he essence of an antitrust claim is to provide redress for injury which flows from an unreasonable restrain on *competition*").

Therefore, Cyber Sound has not actually alleged any harm resulting from the anticompetitive effects of Crestron's allegedly exclusionary practices.

**B.     Violation of the Sherman Act § 2**

Section 2 of the Sherman Act provides that it is illegal to "monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  To state a monopolization claim under this section, a plaintiff must allege facts sufficient to demonstrate: "(1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 412-13 (3d Cir. 1997) (internal quotations omitted). In order to prevail on an attempted monopolization claim under this section, "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Here, Cyber Sound's failure to sufficiently define the relevant product market dooms this claim. *See Syncsort Inc.*, 50 F. Supp. 2d at 330-31 ("Viability of claims of monopolization and attempted monopolization under Section Two of the Sherman Act are dependent upon demonstration by a plaintiff why a proposed market is the relevant market."). However, Cyber Sound's monopolization and attempted monopolization claims fail for other reasons as well.

Cyber Sound fails to allege sufficient facts to demonstrate that Crestron possesses monopoly power in the relevant market or is dangerously close to achieving monopoly power. "Monopoly or market power has been defined as the power to control prices or exclude competition in the relevant market." *Syncsort Inc.*, 590 F. Supp. 2d at 329 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). "[A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive. Other factors to be considered include the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992) (internal citations omitted).

Here, Cyber Sound alleges, on information and belief, that Crestron possesses an 80% market share in the market for high-end residential automation and control systems in the United

States.  Am. Countercl. ¶ 8.  Other than this conclusory assertion of market power, Cyber Sound pleads no other facts in support of Crestron's supposed monopoly power.  Cyber Sound makes no allegations regarding the market-shares held by Crestron's competitors, the strength of the competition between Crestron and its competitors, the barriers to entry, or the elasticity of consumer demand.  "Accepting as true all factual allegations contained in the Answer and Counterclaims, this single statement of market power in the pleadings of [Cyber Sound] is an insufficient allegation of the possession of monopoly power, or even of the dangerous probability of achieving monopoly power."  *Syncsort Inc.*, 50 F. Supp. 2d at 330.  Therefore, Cyber Sounds Sherman Act § 2 claim will be dismissed.

###   C.   <u>Violation of the Clayton Act, 15 U.S.C. § 14</u>

Cyber Sound did not respond to Crestron's arguments in support of its motion to dismiss Cyber Sound's claim for a violation of the Clayton Act; therefore, the motion will be considered unopposed with respect to this claim.  However, the Court finds that Crestron has convincingly demonstrated that Cyber Sound has failed to state a claim for a violation of the Clayton Act for which relief can be granted.  In order to state a claim for relief under this section of the Clayton Act, a plaintiff must plead three elements:

> First, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case.  Second, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.
> . . .
>
> Third, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.  That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited as was pointed out in *Standard Oil Co. v. United States,*[337 U.S. 293 (1949)].

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).  Cyber Sound fails to allege

sufficient facts, taken as true, to plausibly demonstrate that Crestron's actions have "significantly

limited" opportunities for other competitors to enter into or remain the market; therefore, Cyber

Sound has not adequately alleged that a substantial share of the market has been foreclosed.

Accordingly, Cyber Sound's Clayton Act claim will be dismissed.

      **D.**       **Violation of the Arizona Antitrust Act, §§ 44-1401 *et seq*.**

      Cyber Sound claims that Crestron has violated section 44-1403 of the Arizona Antitrust

Act, which provides that "[t]he establishment, maintenance or use of a monopoly or an attempt

to establish a monopoly of trade or commerce, any part of which is within this state, by any

person for the purpose of excluding competition or controlling, fixing or maintaining prices is

unlawful."  Ariz. Rev. Stat. § 44-1403.  Both parties agree that the pleading requirements under

the Arizona Antitrust Act are identical to those under the Federal antitrust statutes.  *See Pasco*

*Indus., Inc. v. Talco Recycling, Inc.*, 985 P.2d 535, 542 (Ariz. Ct. App. 1998) ("Because § 2, like

A.R.S. section 44-1403, prohibits monopolistic behavior by individual persons or entities . . . we

analyze the requirements necessary to prove a violation of section 44-1403 under federal case

law interpreting § 2 of the Sherman Act."); *Laborers' & Operating Eng'rs' Util. Agreement*

*Health & Welfare Trust Fund for Arizona v. Philip Morris, Inc*., 42 F. Supp. 2d 943, 949 (D.

Ariz. 1999) ("Arizona's antitrust act mirrors federal law and is analyzed and construed in

harmony with federal law.").  Accordingly, for the same reasons discussed above in relation to

Cyber Sound's Federal antitrust claims, the Arizona Antitrust Act claim will be dismissed.

      **E.**       **Choice of Law**

      Because Cyber Sound's counterclaims for Interference with Contract, Interference with

Prospective Economic Advantage, and Defamation are based on state law, the Court must

consider which State's laws apply.[2]  This Court applies New Jersey choice of law rules in determining which law applies.  *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 333 (D.N.J. 2005).  New Jersey applies the "most significant relationship" test in determining which law applies.  *P.V. v. Camp Jaycee*, 962 A.2d 453 (N.J. 2008).  Under this test, the court first determines whether an actual conflict exists among the potentially applicable laws, and second, if a conflict exists, the court weights the factors enumerated in the Restatement section corresponding to the cause of action.  *Id.* at 460.  Where no conflict exists, there is no choice-of-law issue to be resolved.  *Id*.

There is no conflict between the laws of New Jersey and Arizona with regard to the elements of a claim for Interference with Contract.  *Compare Dello Russo v. Nagel*, 817 A.2d 426, 434 (N.J. Super. Ct. App. Div. 2003) ("plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage"); *with Hill v. Peterson*, 35 P.3d 417, 420 (Ariz. App. 2001) ("plaintiff must prove the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.  Furthermore, the interference must be improper as to motive or means before liability will attach.") (internal quotations and citations omitted).

---

[2] Crestron, in its motion to dismiss, analyzes these claims under New Jersey law, while Cyber Sound, in its opposition, analyzes them under Arizona law.  Without any choice of law analysis, Cyber Sound asserts that Arizona law "certainly must be the relevant prevailing law under which to test Cyber Sound's claims."  Opp. Br. 12.  In its reply brief, Crestron contends that the question is immaterial as there is no conflict between Arizona and New Jersey law with respect to these claims.  Reply Br. 11 n.4.

Likewise, there is no conflict between the laws of the two states with regard to the elements of a claim for Interference with Prospective Economic Advantage. *Compare Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir. 1992) ("Under New Jersey law, the five elements of a claim of tortious interference with a prospective business relationship are: (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.") *with Hill*, 35 P.3d at 420 (same elements as those for Interference with Contract).

Finally, there is also no conflict between the laws of New Jersey and Arizona regarding the elements of defamation claim. *Compare Dello Russo*, 817 A.2d at 431 ("To establish a prima facie case of defamation . . . a plaintiff must show that defendant communicated a false statement about plaintiff to a third person that harms plaintiff's reputation in the eyes of the community or deters third persons from associating with the plaintiff.") *and Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986) ("In the case of a complaint charging defamation, plaintiff must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication.  A vague conclusory allegation is not enough.") *with Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977) (defamation claim requires a false statement that is published and fault amounting to at least negligence on the part of the publisher) *and Athans v. Starbucks Coffee Co.*, No. 06-1841, 2007 WL 899130, at *2 (D. Ariz. Mar. 23, 2007) (applying Arizona law and dismissing defamation claim based, in part, on failure to specifically allege the identity of the people who made the allegedly defamatory statements or the content of those statements).

1.    *Defamation*

The basis of Cyber Sound's claims for Defamation, Interference with Contract, and Interference with Prospective Economic Advantage is Crestron's allegedly false and misleading statements about Cyber Sound to its customers and potential customers.  *See* Am. Countercl. ¶¶ 67, 70, 73. 75, 79.  Cyber Sound alleges that Crestron intentionally harmed Cyber Sound by falsely stating that: Cyber Sound was no longer an authorized Crestron dealer and could not service Crestron products at a time when it was still authorized; that "Cyber Sound and its technical staff were incompetent in regard to the design, installation, programming and servicing of high-end residential automation and control systems;" and that due to Crestron's lawsuit against Cyber Sound, "Cyber Sound's viability as a company was questionable and it likely would not be in business for very long."  *Id.* ¶ 70.

Crestron argues that Cyber Sound's claim for defamation fails to demonstrate entitlement to relief because: the allegations fail to provide sufficient specificity regarding who stated what specific words to whom and when; some of the alleged statements are not false; and some are statements of opinion, which cannot be defamatory.  Cyber Sound argues that its Counterclaim lists specific customers and prospective customers to whom the allegedly defamatory statements were made.  However, the paragraphs in the Amended Counterclaim cited by Cyber Sound do not provide lists of individuals to whom statements were made.  *See* Am. Countercl. ¶¶ 68, 74. Rather, these paragraphs simply list customer and prospective customers with which Crestron allegedly interfered.  In other words, Cyber Sound does not allege who said what to these entities and individuals when.

For example, in paragraph 68 of the Amended Counterclaim, Cyber Sound lists customers with which Crestron allegedly interfered.  Cyber Sound then alleges that "[i]n connection with such contacts, Crestron, with and through competitive Crestron dealers . . . made

knowingly false or misleading statements about Cyber Sound, in order to induce Cyber Sound's customers to switch to Crestron products." Am. Countercl. ¶ 69. Therefore, Cyber Sound does not allege that Crestron actually made any of the statements listed in paragraph 70 to any of the customers listed in paragraph 68. Cyber Sound merely alleges that "in connection" with its customers, Crestron, "with and through" third parties, made allegedly defamatory statements. These allegations fail to state who at Crestron made such statements, who at Crestron's dealers made these statements that are somehow attributable to Crestron, when these statements were made, and to whom at these customers (which are home building and/or design entities) these statements were made.[3]

"A claim for defamation 'must be plead (sic) with particularity and thus must set forth the facts identifying the defamatory statements, their utterer, and their publication.'" *Novartis Pharms. Corp. v. Bausch & Lomb, Inc.*, No. 07-5945, 2008 WL 4911868, at *5 (D.N.J. Nov. 13, 2008) (quoting *Zoneraich*, 514 A.2d at 63). As in *Novartis Pharms. Corp.*, Cyber Sound fails to state a claim for defamation because it "fails to allege by whom, or to whom, the allegedly defamatory statements were made, what words were uttered, or when the statements were made." *Id.* at *6. Accordingly, the claim for defamation will be dismissed.

### 2. Interference with Contract & Interference with Prospective Economic Advantage

Crestron argues that Cyber Sound fails to state a claim for Interference with Contract and Interference with Prospective Economic Advantage because it has not sufficiently alleged facts

---

[3] To the extent that Cyber Sound alleges that these defamatory statements were made by Crestron's dealers to Cyber Sound's customers, Cyber Sound does not allege who at these dealers made the statements. In fact, Cyber Sound names only two Crestron dealers "with and through" whom such statements were made. *See* Am. Countercl. ¶¶ 69, 75. To the extent that Cyber Sound's allegations of statements by unknown individuals at third parties to unknown recipients at unknown times are sufficient, Cyber Sound offers no explanation as to why such statements should be attributable to Crestron. In fact, as Crestron points out, its dealer agreements expressly provide that its dealers are not agents or legal representatives of Crestron.

indicating that Crestron's interference was improper or without justification.  Crestron contends that because Cyber Sound cannot show that Crestron's statements were defamatory, these statements cannot satisfy the improper or without justification element for an Interference with Contract claim.  Cyber Sound argues that it has sufficiently pled facts satisfying this requirement: that Crestron and its competitive dealers made false and misleading claims about Cyber Sound to its customers.  Crestron has not demonstrated that because Cyber Sound has failed to allege facts sufficient to state a claim for defamation it automatically follows that it cannot satisfy the pleading requirements for a claim of Interference with Contract, with respect to the "improper" or "without justification" element.  *See Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. 94-3623, 2008 WL 1925304, at *8 (D.N.J. Apr. 30, 2008) ("The inquiry into whether the defendant's actions were improper is flexible and guided by the following factors on a case-by-case basis: (i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties.") (citing *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002)).  Indeed, Crestron has cited no legal authority for such a proposition.

While the Court finds that Cyber Sound has not pled facts sufficient to demonstrate entitlement to relief for defamation, at this stage, the Court does not find that Cyber Sound has failed to state a claim for relief for Interference with Contract or Prospective Economic Advantage.  Cyber Sound has alleged that it had valid contracts or reasonably probable expectations of economic benefit; that Crestron knew of these contracts or expectancies; that Crestron intentionally interfered with these contracts or expectancies without justification; and

that Cyber Sound would have received the expected economic benefit but for Crestron's interference.  Crestron has not demonstrated that Cyber Sound's allegations fail to satisfy the "improper" or "without justification" requirement of the claims for Interference with Contract and Prospective Economic Advantage, and it chose not to challenge Cyber Sound's pleading with respect to any of the other elements of these claims.  Accordingly, the motion to dismiss will be denied as to the claims for Interference with Contract and Prospective Economic Advantage.

### F.   Violation of the Lanham Act, 15 U.S.C. § 1125(a)

In order to state a claim for relief for false advertising under the Lanham Act, a plaintiff must allege that: (1) the defendant made false or misleading statements about the nature, characteristics, qualities, geographic origins of his or another's goods, services, or commercial activities in commercial advertising or promotion; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff.  15 U.S.C. § 1125(a); *United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922-23 (3d Cir. 1990).  District courts in the Third Circuit apply an intermediate pleading standard to false advertising claims under the Lanham Act, requiring "more particularity than traditional notice pleading under [Fed. R. Civ. P.] 8, but something less than the specificity required under Rule 9." *Graco,* 2009 WL 904010, at *24.

Crestron argues that Cyber Sound fails to meet this intermediate standard for pleading the "false or misleading statements" element of its Lanham Act claim, because it does not provide the necessary specificity regarding the speaker, recipient, and content of these statements.  Cyber Sound alleges that the statements referenced in paragraph 70 of the Counterclaim, discussed

21

above, constitute the requisite false or misleading statements of its false advertising claims.  As discussed above in the section addressing the defamation claim, Cyber Sound has not alleged with sufficient specificity what false or misleading statements were actually made by individuals at Crestron, the context in which those statements were made, and two whom they were made.  Additionally, Cyber Sound has failed to make clear that any allegedly false or misleading statements were made by Crestron itself, as opposed to its dealers, who are not agents or legal representatives of Crestron.  Therefore, due to its vague and imprecise allegations regarding Crestron's statements, Cyber Sound has failed to meet the heightened pleading standard applied to its Lanham Act Claim.  Accordingly, this claim will be dismissed.

## V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant in part and deny in part Crestron's motion to dismiss.  Cyber Sound's counterclaims for Interference with Contract (Count V) and Interference with Prospective Economic Advantage (Count VI) will proceed.  Cyber Sound's counterclaims for Violation of the Sherman Act, 15 U.S.C. § 1 (Count I); Violation of the Sherman Act, 15 U.S.C. § 2 (Count II); Violation of the Clayton Act, 15 U.S.C. § 14 (Count III); Violation of the Arizona Antitrust Act, §§ 44-1401 *et seq.* (Count IV); Defamation (Count VII); and Violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count VIII) will be dismissed.

These claims being dismissed will be dismissed with prejudice as permitting Cyber Sound another opportunity to amend would be futile.  Cyber Sound has already amended its counterclaims once in response to Crestron's first motion to dismiss and has, therefore, "presented [its] best allegations, and . . . any further amendment would not cure the deficiencies."  *Dock v. Rush*, 432 Fed. Appx. 130, 134 (3d Cir. 2011); *see also In re Savient Pharm., Inc. Sec. Litig.*, 283 Fed. Appx. 887, 888 (3d Cir. 2008) (affirming district court's dismissal of a second amended complaint with prejudice where district court found that "plaintiff

had already had 'two large bites at the apple' and because further amendment would be futile");

*Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005) ("a district court has discretion to deny a request to amend if it is apparent from the record that . . . the amendment would be futile"). With respect to Cyber Sound's antitrust claims, permitting it to amend would be futile as Cyber Sound, even if it could cure its deficient definition of a relevant product market, cannot demonstrate an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 329 (D.N.J. 1999) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). With respect to its defamation and false advertising claims, Cyber Sound, after already amending its complaint once, has failed to allege with adequate specificity that an agent or representative of Crestron actually made false statements about Cyber Sound. An appropriate Order follows.

/s/ Faith S. Hochberg_____
Hon. Faith S. Hochberg, U.S.D.J.